NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO R.W.

No. 1 CA-JV 23-0121
FILED 3-5-2025

Appeal from the Superior Court in Mohave County
No. B8015JD201904074
The Honorable Rick Williams, Judge

**AFFIRMED**

COUNSEL

Your AZ Lawyer, Phoenix
By Robert Ian Casey
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer L. Thorson
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Andrew M. Jacobs and Judge Angela K. Paton joined.

---

**B R O W N**, Judge:

¶1        Erick W. ("Father") appeals the juvenile court's termination of his parental rights as to R.W., his daughter, who was born in October 2020.[1]  For the following reasons, we affirm.

## BACKGROUND

¶2        On October 27, 2020, R.W. was born substance exposed to methamphetamine in California.  California Child Protective Services had custody of R.W. until February 2021, after which she was placed in a foster home in Arizona so she could live with her half-siblings.  When R.W. was born, Father was incarcerated in Nevada for possessing a stolen vehicle.  In March 2021, after pleading guilty, Father received a sentence ranging from a minimum of 19 months to a maximum of 48 months, with credit for 153 days of presentence incarceration.

¶3        Father learned about R.W.'s birth from his sister, and once he was able to send letters from prison, he wrote a letter to the Arizona Department of Child Safety ("DCS") in May 2021. In that letter, he said he did "not give up [his] parental rights" and asked that DCS establish his paternity.  After confirming Father's paternity in August the same year, a DCS case manager wrote to Father a month later encouraging him to send cards, letters, and pictures to R.W.  Father sent DCS pictures, a couple of cards, and a letter for R.W. in early October, which DCS acknowledged receiving a few weeks later.

¶4        The extent and nature of Father's contact with DCS after this exchange is disputed.  Father claimed that he sent approximately 13 or 14 letters to DCS, and attempted to call DCS numerous times but was unable to get through.  DCS, conversely, noted only three instances during these proceedings when it received mail from Father.  Father also claimed he was

---

[1]        The court also terminated R.W.'s mother's parental rights, but she is not a party to this appeal.

contacting R.W. through his sister, who had visits with R.W., and that during such visits Father's sister arranged calls between him and R.W. Though Father testified that he informed DCS of such calls, DCS denied knowing of them. Father admitted he stopped having these calls when his sister stopped having visits with R.W. for at least 8 months, but he also claimed he sent letters to R.W. during that time.

¶5            In November 2021, DCS moved to terminate Father's parental rights based on the length of his sentence under A.R.S. § 8-533(B)(4). A year later, DCS amended its motion to include abandonment under A.R.S. § 8-531(1). In 2022, Father was moved to a prison in California for a separate series of charges. Between October 2022 and April 2023, Father was moved to at least four different jails or prisons. In January of 2023, a second case manager replaced the original. Though Father claimed that he wrote to DCS informing it of his whereabouts, the new case manager stated she had no idea where he was, and that it was difficult to find him. When the case manager was able to contact Father by mail in January 2023, he responded by sending three letters at the same time.

¶6            The juvenile court held a contested termination adjudication hearing in April 2023. Father testified about his incarceration, contact attempts with DCS, and the contact he had and attempted to have with R.W. The case manager described her understanding of Father's communications with DCS and R.W., and testified that R.W. was doing well at her placement and would benefit from termination.

¶7            The court found that DCS established both grounds for termination by clear and convincing evidence. As to the length-of-sentence ground, the court explained that although "Father was provided opportunities to establish and build a parent-child relationship through DCS," he failed to do so, and that he had been incarcerated throughout R.W.'s life. The court also took judicial notice that Father had a pending felony matter in Mohave County, for which there was "an active extraditable warrant." For the abandonment ground, the court found that Father "failed to maintain regular contact with [R.W.] despite having an opportunity to do so," and he "made only minimal efforts to support and communicate with her for more than six months." The court also determined that termination was in R.W.'s best interests. Father timely appealed, and we have jurisdiction under A.R.S. § 8-235(A).

**DISCUSSION**

**¶8**        To terminate parental rights, a court must find (1) by clear and convincing evidence that at least one statutory ground in A.R.S. § 8-533(B) has been proven, and (2) by a preponderance of the evidence that termination is in the child's best interests. *See Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286, ¶ 15 (App. 2016).  We will affirm the juvenile court's factual findings "if reasonable evidence and inferences support them." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶ 30 (2023).  And we will affirm the court's legal conclusions regarding the statutory grounds for termination "unless they are clearly erroneous." *Id.* at 478–79, ¶ 31.  The "clearly erroneous" standard of review means that "this finding will be affirmed unless the appellate court determines 'as a matter of law that no one could reasonably find the evidence to be clear and convincing.'" *Id.* at 481, ¶ 46 (citation omitted).

**¶9**        Father does not challenge the juvenile court's legal conclusion or related factual findings that DCS met its burden of proving the statutory grounds under § 8-533(B)(4) (length of sentence).[2]  He has therefore abandoned and waived any issues relating to the court's ruling on the length of sentence ground. *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577, ¶ 5 (App. 2017) (holding that mother's failure to challenge one of the grounds for termination constituted waiver and abandonment of any contention that the juvenile court erred by terminating her parental rights on that ground).  Even if Father's briefing can reasonably be construed as challenging the reunification services component of the length of sentence ground, *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574 (2021), he has not shown the court erred.

**¶10**        Father argues DCS failed to make diligent reunification efforts by not "even attempt[ing] to find Father when he was incarcerated," and by placing the burden on him to communicate with R.W.  The record shows otherwise.

**¶11**        DCS reached out to Father shortly after confirming his paternity, offering to forward any cards, letters, and pictures from Father to R.W.  Father evidently understood how to contact DCS and to send such materials, as he did so three times while incarcerated. These contacts resemble those noted by our supreme court when it suggested what incarcerated parents could do to maintain a bond with their children in

---

[2]        Father has not challenged the juvenile court's finding that termination was in R.W.'s best interests.

*Jessie D.*, 251 Ariz. at 581, ¶ 17  (noting that "an incarcerated parent can maintain a bond with a child" in several ways, including through "letters, pictures, and gifts").

**¶12**        Father suggests that DCS was not proactive enough in locating him as he moved between correctional facilities.  Though Father contends that "DCS had the ability to locate [him] without him having to be a willing participant" in their searching, the record does not  support his contention.  The second DCS case manager testified that she had difficulty locating Father.  When she did locate him, she verified his location and prepared a letter to send him, but by the time it was ready to send, Father had already relocated to a different facility.  The case manager further testified that when a parent moves multiple times through a case without providing updated contact information, it complicates DCS's ability to provide services.  Father does not explain how, on this record, DCS's efforts to locate him were deficient under the unique circumstances of his incarceration.

**¶13**        Because Father has not shown that DCS failed to meet its obligation to reasonably facilitate the type of contacts contemplated under *Jessie D.*, we do not address Father's argument, raised for the first time on appeal, that DCS had a constitutional obligation to provide services before terminating Father's rights under the abandonment ground, § 8-533(B)(1). *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 177, 178–79, ¶¶ 10, 16 (App. 2014) (holding that arguments not raised in the juvenile court are generally waived on appeal); *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 376–77, ¶ 14 (App. 2010) ("[W]e will affirm the termination if any one of the statutory grounds is proven and if the termination is in the best interest of the children . . . and accordingly do not address the other statutory grounds for termination.").

**CONCLUSION**

**¶14**        We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA